**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**

| | |
|---|---|
| MICHAEL FARZAD, Derivatively on Behalf of UWM HOLDINGS CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>MATHEW ISHBIA, JEFFREY A. ISHBIA, JUSTIN ISHBIA, MELINDA WILNER, ALEX ELEZAJ, LAURA LAWSON, ISIAH THOMAS, KELLY CZUBAK, ROBERT VERDUN, and STACEY COOPES,<br><br>Defendants,<br><br>-and-<br><br>UWM HOLDINGS CORPORATION, a Delaware Corporation,<br><br>Nominal Defendant. | Case No.: |

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND UNJUST ENRICHMENT**

Plaintiff, by his attorneys, submits this Verified Stockholder Derivative Complaint for Breach of Fiduciary Duty and Unjust Enrichment. Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to plaintiff which are based on personal knowledge. This complaint is also based on the investigation of plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1. This is a stockholder derivative action brought by plaintiff on behalf of nominal defendant UWM Holdings Corporation ("UWM" or the "Company") against certain of its officers and directors for breaches of fiduciary duties and violations of law. These wrongs resulted in significant damages to UWM's reputation, goodwill, and standing in the business community, as well as exposing the Company to potential liability for violations of state and federal law.

2. UWM is the largest wholesale mortgage lender and the largest overall residential mortgage originator in the United States. The Company is controlled and dominated by defendant Mathew Ishbia ("Mat Ishbia"). Mat Ishbia serves simultaneously as UWM's Chairman, President, and Chief Executive Officer ("CEO") and, together with his family holding vehicle, SFS Holding Corp. ("SFS Corp."), controls a supermajority of the Company's voting power.

3. SFS Corp. holds and directs 79% of the voting power of the Company's outstanding stock. Mat Ishbia, in turn, is the President and sole director of SFS Corp. Through this control, Mat Ishbia effectively hand-picks the Company's directors and officers. Mat Ishbia has further entrenched his power by appointing his family members to positions of power at UWM. Mat Ishbia's father, defendant Jeffrey A. Ishbia ("Jeff Ishbia"), is the Company's founder and sits on the Board of Directors (the "Board"). Further, defendant Justin Ishbia, Mat Ishbia's brother, serves on

UWM's Board. The Ishbia family's control extends into the committee structure. Mat Ishbia also sits on the Compensation Committee and recommends the compensation, performance metrics, and targets for every other named executive officer, including the three executive-officer directors who serve at his pleasure. In short, Mat Ishbia runs the operations of UWM as his own personal fiefdom, and the Company's most strategic decisions are his alone to make.

4. One of Mat Ishbia's publicly stated directives is that UWM would and will not hedge its mortgage servicing rights ("MSRs" or "MSR"). He claimed that UWM's origination franchise was a built-in, or "natural," hedge. Mat Ishbia personally and repeatedly advanced this position to the market, telling analysts on the Company's November 6, 2025 earnings call that "[w]e do not hedge our MSRs" and that "anyone that ... focuses on the MSRs and the fair value just does not understand mortgages."

5. Contrary to its long-standing "no-hedge" philosophy, UWM secretly established a massive, standing interest-rate derivatives position during the first quarter of 2026. UWM revealed the position months later, obscured under the label "other interest rate derivatives." The position carried a notional value of $27.5 billion, roughly ten times the Company's entire market capitalization. The position was not a true hedge. A hedge offsets risk by moving opposite to the asset being protected. This position was a directional wager, a one-way bet that paid off only if

interest rates fell, the same direction in which UWM's origination business already profited. It therefore amplified UWM's existing risk rather than offset it, as expected by a hedge. By March 31, 2026, the position was already a $288 million liability that had run a $138.2 million loss through the first-quarter income statement. Further, the position required approximately $670 million of Company cash, more than 40% of UWM's total equity, to be posted as margin.

6. In December 2025, UWM entered into an all-stock merger agreement, valued at approximately $1.3 billion, to acquire Two Harbors Investment Corp. ("Two Harbors"), a transaction that would have roughly doubled UWM's MSR book to approximately $400 billion. However, in March 2026, Two Harbors terminated the agreement after CrossCountry Mortgage, LLC ("CrossCountry") stepped in with a competing cash offer.

7. Beginning on March 9, 2026, the Individual Defendants (as defined herein) made materially false and misleading statements concerning the Company's risk profile and hedging activities, and failed to disclose that: (i) UWM had deviated from its traditional strategy of not hedging its MSRs to take a major hedge position; (ii) the Company over-hedged itself in anticipation of the Two Harbors transaction; and (iii) UWM's purported efforts to balance its risk in fact created an excess hedging risk. The purpose of the statements was to conceal the Company's risk.

8. The truth emerged on August 5, 2026, when UWM reported a $603.2 million interest-rate derivatives loss that contributed to a $451.9 million second-quarter net loss, and total equity fell 43.6% year over year. The next day, on the Company's earnings call, Mat Ishbia admitted that "[w]e were over-hedged, if you think of it that way, protecting against the Two Harbors transaction." On this news, UWM's stock price fell from $1.84 per share on August 5, 2026, to $1.20 per share on August 6, 2026, a one-day decline of 34.78% and a $219 million market capitalization loss.

9. The undisclosed derivatives bet did far more than generate a one-quarter loss. It broke the Company's balance sheet and forced UWM to accept a costly and dilutive $2.05 billion emergency capital infusion from Oaktree Capital Management ("Oaktree") and the Ishbia family's SFS Group Capital, LLC ("SFS Group"). In addition, UWM suspended its common dividend. The $2.05 billion rescue was structured as senior preferred equity, $150 million of which was purchased by the Ishbia family's own vehicle, SFS Group, in the form of Series A-2 Preferred Stock. That preferred stock accrues a cumulative dividend: 10% if paid in cash, or 13% if unpaid, compounding quarterly whether or not declared. It also ranks ahead of the common stock upon liquidation. Thus, at the same moment the common stockholders lost their dividend, Mat Ishbia's family secured for itself a

senior, dividend-bearing position in the very Company his misconduct had imperiled.

10. Rather than providing the market with correct information, Mat Ishbia used his knowledge of UWM's material, nonpublic information to sell his personally held UWM stock while the Company's stock was artificially inflated, before the truth was revealed and the stock collapsed. While UWM's stock price was artificially inflated, Mat Ishbia sold over $152.3 million worth of his UWM stock through SFS Corp.

11. Further, as a direct result of this unlawful course of conduct, UWM is now the subject of a federal securities class action lawsuit filed in the U.S. District Court for the Eastern District of Michigan on behalf of investors who purchased UWM's shares titled *Bond v. UWM Holdings Corporation, et al.*, Case No. 2:26-cv-12862 (the "Securities Class Action").

## JURISDICTION AND VENUE

12. Jurisdiction is conferred by 28 U.S.C. §1332. Complete diversity among the parties exists and the amount in controversy exceeds $75,000, exclusive of interest and costs.

13. This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts

with this District to render the exercise of jurisdiction by the district courts permissible under traditional notions of fair play and substantial justice.

14. Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (i) UWM maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to UWM, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

15. Plaintiff Michael Farzad was a stockholder of UWM at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current UWM stockholder. Plaintiff is a citizen of California.

**Nominal Defendant**

16. Nominal defendant UWM is a Delaware corporation with principal executive offices located at 585 South Boulevard East, Pontiac, Michigan. Accordingly, UWM is a citizen of Delaware and Michigan. UWM is the publicly

traded indirect parent company of United Wholesale Mortgage, LLC ("UWM LLC"), which is the largest overall residential mortgage lender and purchase lender in the United States. UWM LLC primarily originates conforming and government loans across all fifty states and the District of Columbia. SFS Corp., UWM LLC, and UWM Holdings, LLC completed a business combination with Gores Holdings IV, Inc. on January 21, 2021, and following completion of the business combination Gores Holdings IV, Inc. proceeded to operate as UWM. As of December 31, 2025, UWM had approximately 9,100 employees.

**Defendants**

17. Defendant Mat Ishbia has been UWM's President, CEO, Chairman of the Board, and a director since January 2021. Mat Ishbia has also been UWM LLC's President and CEO since June 2013. Mat Ishbia also held various roles of increasing responsibility at UWM LLC from 2003 to June 2013. Mat Ishbia is the son of Jeff Ishbia, and the brother of Justin Ishbia. Mat Ishbia is named as a defendant in the related Securities Class Action that alleges he violated sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). While in possession of material, nonpublic information concerning UWM's true business health, Mat Ishbia sold 41,487,684 shares of his stock for $152.3 million in proceeds. UWM paid Mat Ishbia the following compensation as an executive:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2025 | $600,000 | $1,077,193 | $5,269,280 | $3,014,828 | $9,961,301 |
| 2024 | $600,000 | $1,032,683 | $9,580,824 | $1,937,428 | $13,150,935 |
| 2023 | $600,000 | $1,153,600 | $9,153,144 | $1,261,375 | $12,168,119 |

Mat Ishbia is a citizen of Michigan.

18. Defendant Jeff Ishbia has been a UWM director since January 2021, and an Advisor to the CEO since at least April 2023. Jeff Ishbia was also UWM LLC's Executive Chairman from July 1986 to January 2021. Jeff Ishbia founded UWM LLC in July 1986. Jeff Ishbia is the father of Mat Ishbia and Justin Ishbia. UWM paid Jeff Ishbia the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | All Other Compensation | Total |
|---|---|---|---|
| 2025 | $1,670,600 | - | $1,670,600 |
| 2024 | $1,599,700 | - | $1,599,700 |
| 2023 | $1,545,700 | $113 | $1,545,813 |

Jeff Ishbia is a citizen of Michigan.

19. Defendant Justin Ishbia has been a UWM director since January 2021. Justin Ishbia is the son of Jeff Ishbia, and the brother of Mat Ishbia. UWM paid Justin Ishbia the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Annual Equity Award | Total |
|---|---|---|---|
| 2025 | $135,000 | - | $135,000 |
| 2024 | $132,000 | $24,999 | $156,999 |
| 2023 | $132,000 | $9,998 | $141,998 |

Justin Ishbia is a citizen of Illinois.

20. Defendant Melinda Wilner ("Wilner") has been UWM's Executive Vice President, Chief Operating Officer, and a director since January 2021. Wilner has also been UWM LLC's Executive Vice President and Chief Operating Officer since August 2015. Wilner also held various roles of increasing responsibility at UWM LLC from October 2011 to August 2015. UWM paid Wilner the following compensation as an executive:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2025 | $428,000 | $6,852,808 | $2,413,795 | $5,000 | $9,699,603 |
| 2024 | $413,000 | $5,173,028 | $2,133,121 | $5,000 | $7,724,149 |
| 2023 | $399,000 | $70,658 | $2,369,265 | $21,009 | $2,859,932 |

Wilner is a citizen of Michigan.

21. Defendant Alex Elezaj ("Elezaj") has been UWM's Executive Vice President, Chief Strategy Officer, and a director since January 2021. Elezaj has also been UWM LLC's Executive Vice President and Chief Strategy Officer since April 2018. UWM paid Elezaj the following compensation as an executive:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2025 | $393,000 | $6,844,327 | $2,364,097 | $2,500 | $9,603,924 |
| 2024 | $379,000 | $4,437,894 | $2,085,616 | $10,716 | $6,913,226 |
| 2023 | $369,000 | $64,891 | $2,322,794 | $2,500 | $2,759,185 |

Elezaj is a citizen of Michigan.

22. Defendant Laura Lawson ("Lawson") has been UWM's Executive Vice President, Chief People Officer, and a director since January 2021. Lawson has also

been UWM LLC's Executive Vice President and Chief People Officer since August 2014. Lawson was also UWM LLC's Senior Vice President, Marketing from July 2011 to March 2015. UWM paid Lawson the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2025 | $319,000 | - | $63,323 | $977,732 | $12,346 | $1,372,401 |
| 2024 | $311,000 | $500,000 | $3,688,571 | $873,349 | $5,000 | $5,377,920 |
| 2023 | $299,000 | $500,000 | $43,260 | $948,530 | $5,000 | $1,795,790 |

Lawson is a citizen of Michigan.

23. Defendant Isiah Thomas ("Thomas") has been a UWM director since January 2021. UWM paid Thomas the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Annual Equity Award | Total |
|---|---|---|---|
| 2025 | $135,000 | - | $135,000 |
| 2024 | $132,000 | $24,999 | $156,999 |
| 2023 | $132,000 | $9,998 | $141,998 |

Thomas is a citizen of Michigan.

24. Defendant Kelly Czubak ("Czubak") has been a UWM director since January 2021. Czubak has been a member of UWM's Audit Committee since at least April 2025. UWM paid Czubak the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Annual Equity Award | Total |
|---|---|---|---|
| 2025 | $135,000 | - | $135,000 |
| 2024 | $132,000 | $24,999 | $156,999 |
| 2023 | $132,000 | $9,998 | $141,998 |

Czubak is a citizen of Michigan.

25. Defendant Robert Verdun ("Verdun") has been a UWM director since January 2021. Verdun has been the Chair and a member of UWM's Audit Committee since at least April 2025. UWM paid Verdun the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Annual Equity Award | Total |
|---|---|---|---|
| 2025 | $135,000 | - | $135,000 |
| 2024 | $132,000 | $24,999 | $156,999 |
| 2023 | $132,000 | $9,998 | $141,998 |

Verdun is a citizen of Florida.

26. Defendant Stacey Coopes ("Coopes") has been a UWM director since June 2023. Coopes has been a member of UWM's Audit Committee since at least April 2025. UWM paid Coopes the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Annual Equity Award | Total |
|---|---|---|---|
| 2025 | $135,000 | - | $135,000 |
| 2024 | $132,000 | $24,999 | $156,999 |
| 2023 | $66,000 | $9,995 | $75,995 |

Coopes is a citizen of Michigan.

27. The defendants identified in ¶¶17, 20-22 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶17-26 are referred to herein as the "Director Defendants." The defendants identified in ¶¶24-26 are referred to herein as the "Audit Committee Defendants." Collectively, the defendants identified in ¶¶17-26 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

28. By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe UWM and its stockholders fiduciary obligations of care and loyalty, and were and are required to use their utmost ability to control and manage UWM in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of UWM and not in furtherance of their personal interest or benefit.

29. To discharge their duties, the officers and directors of UWM were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of UWM were required to, among other things:

(a) ensure that the Company established, maintained, and observed adequate internal controls and risk-management systems governing its interest-rate and derivatives exposures, so that the Company did not undertake speculative, company-threatening positions without appropriate Board-level oversight;

(b) ensure that the Company's public statements, press releases, earnings guidance, and filings with the SEC were complete, fair, accurate, timely, and not materially misleading concerning the Company's business, risk profile, and hedging activities;

(c) refrain from trading in UWM securities while in possession of material, nonpublic information, and refrain from using their positions or the Company's confidential information for personal gain;

(d) conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; and

(e) remain informed as to how UWM conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

30. Additionally, the Individual Defendants are required to adhere to the Company's Code of Business Conduct and Ethics (the "Code"). The Code applies to all UWM team members, officers, and directors, and demands that they act with integrity and never "cut ethical or legal corners for the benefit of UWM or for personal benefit." The Code specifically provides that "[n]o one should take unfair advantage of anyone else through manipulation, concealment, abuse of privileged information, misrepresentation of facts or any other unfair practice."

31. The Code imposes an express prohibition on insider trading. It defines "inside information" as "any material nonpublic information, positive or negative, about UWM," where information is "[m]aterial" if "a reasonable stockholder would consider the information useful when buying or selling securities" and "[n]onpublic" if it "is confidential and has not yet been shared broadly outside of UWM." The Code commands that "we never buy or sell securities based on inside information, nor do we tip-off others to do so," emphasizing that "using material nonpublic information to make a trade is never acceptable" and "violates the law and the trust we've built."

32. The Code separately provides that "[t]eam members, officers and directors are prohibited from taking for themselves business opportunities that are discovered through the use of corporate property, information or position," and that "[n]o team member, officer or director may use corporate property, information or position for personal gain." The Company's material, nonpublic information concerning the undisclosed derivatives position was such corporate property.

33. The Code further requires accurate public disclosure. Those involved in the preparation of UWM's SEC reports and public communications must "[t]ake all necessary steps to ensure that all filings with the SEC and all other public communications about our financial and business condition provide full, fair, accurate, timely and understandable disclosure," and any person who "believe[s] that

any disclosure is materially misleading" must bring it to the attention of the Chief Legal Officer.

34. UWM's Board has adopted a written Statement of Policies and Procedures Governing Stock Trading in General and the Prevention of Insider Trading that prohibits all directors, officers, and employees from trading in Company stock while in possession of material nonpublic information, and that prohibits officers and directors from entering into hedging or monetization transactions, such as zero-cost collars and forward sale contracts, designed to lock in the value of their UWM holdings. As alleged below, while the Individual Defendants concealed the existence and mounting losses of the Company’s undisclosed derivatives position, the Company's controlling fiduciary, Mat Ishbia, was simultaneously disposing of UWM stock, conduct squarely at odds with the policies the Board itself adopted.

**Breaches of Duties**

35. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of UWM, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

36. The Individual Defendants breached their duty of loyalty by allowing defendants to cause, or by themselves causing, the Company to: (i) abandon its stated no-hedge philosophy and amass an undisclosed, oversized, directional interest-rate derivatives position;[1] (ii) engage in insider trading; and (iii) make materially false and misleading statements. These improper practices wasted the Company's assets and caused UWM to incur substantial damage.

37. The Individual Defendants, because of their positions of control and authority as officers and directors of UWM, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions. As a result, and in addition to the damage the Company has already incurred, UWM has expended, and will continue to expend, significant sums of money.

**Additional Duties of the Audit Committee Defendants**

38. In addition to these duties, under the Audit Committee Charter in effect since October 27, 2025, the Audit Committee Defendants, Czubak, Verdun, and Coopes, owed specific duties to UWM to assist the Board in overseeing statements

[1] An interest-rate derivative is a financial contract whose value is derived from changes in interest rates, rather than from owning an actual asset like a stock or a bond. Nobody is buying or selling a physical thing; they're making a bet (or hedge) on which direction rates will move, and by how much.

concerning the Company's hedging risk. The Audit Committee Charter charges the Audit Committee with overseeing "the accounting and financial reporting processes of the Company," and with assisting the Board in its oversight of "(1) the integrity of the Company's financial statements, [and] (2) the Company's compliance with legal and regulatory requirements."

39. Most significantly, the Audit Committee Charter expressly assigns the Audit Committee responsibility to "[d]iscuss guidelines and policies governing the process by which senior management of the Company assess and manage the Company's exposure to risk, as well as the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures." The undisclosed $27.5 billion interest-rate derivatives position was precisely such a "major financial risk exposure."

40. The Charter further required the Audit Committee Defendants to "[r]eview with management and the Company's independent auditors, the annual audited financial statements and quarterly financial statements, including reviewing the Company's disclosures under 'Management's Discussion and Analysis of Financial Condition and Results of Operations.'" The Audit Committee Defendants were also required to review "any fraud, whether or not material, that involves management," and to receive periodic reports on "off-balance sheet structures[] that may have a bearing on the financial statements." The Audit Committee Charter

additionally required the Audit Committee to review the type and presentation of information in the Company's earnings press releases and the "earnings guidance provided by the Company to analysts."

41. While the Audit Committee Defendants had clear responsibilities with respect to ensuring that there were controls regarding the accuracy of the Company's financial disclosures and the Company's communication with the public, the Audit Committee Defendants failed to fulfill these responsibilities. In fact, the Audit Committee Defendants have gravely harmed the Company by taking part in the publishing of false and misleading statements and omissions of material fact described herein.

## UWM'S BUSINESS AND THE CENTRAL ROLE OF MORTGAGE SERVICING RIGHTS

42. UWM's mortgage business consists of two distinct functions that respond in opposite ways to changes in interest rates: origination and servicing. "Origination" is the business of making a new mortgage loan. UWM underwrites, funds, and closes loans submitted by independent brokers, and earns revenue primarily through the "gain on sale" realized when it sells those loans into the secondary market. Origination volume is highly sensitive to interest rates: when rates fall, existing homeowners refinance into new, lower-rate loans, and new home purchases increase; when rates rise, refinancing activity declines sharply and purchase volume slows.

43. Once a loan closes, a separate function known as "servicing" collects the borrower's monthly payments, manages escrow accounts, and administers the loan going forward. The contractual right to perform this function, and to retain a fee for doing so, is a MSR. UWM routinely retains MSRs after selling the underlying loans, and its MSR portfolio represents the present value of the servicing fees UWM expects to collect over the life of hundreds of billions of dollars in loans it has originated.

44. An MSR's value depends on how long the underlying loan is expected to remain outstanding. The principal risk to that value is prepayment, most commonly done when a borrower refinances into a new loan when interest rates fall. When rates fall, prepayments accelerate, shortening the expected life of UWM's MSRs and reducing their value. When rates rise, prepayments slow, extending the expected life of the MSRs and increasing their value.

45. Origination and MSR values therefore move in opposite directions in response to the same interest-rate change. Falling rates depress MSR values but drive a surge in new originations (including the very refinances that shorten the life of existing MSRs). Rising rates increase MSR values but suppress origination volume. UWM has long taken the public position that these offsetting effects mean its origination business itself operates as a "natural hedge" to its MSR portfolio,

obviating any need for the Company to enter into separate interest-rate derivatives to protect the value of its MSRs.

46. UWM is the largest wholesale mortgage lender and the largest overall residential mortgage originator in the United States, originating loans exclusively through the independent broker channel. In 2025, UWM reported total originations of $163.4 billion and maintained a MSR portfolio with an unpaid principal balance of approximately $240.8 billion.

## THE ISHBIA FAMILY CONTROLS UWM

47. UWM is a controlled company dominated by Mat Ishbia, who serves simultaneously as UWM's Chairman, President, and CEO and, together with his family-holding vehicle, controls a supermajority of the Company's voting power. The interest-rate bet at the heart of this action was, by Mat Ishbia's own account, his personal decision.

### Mat Ishbia's Hands-On Control Has Previously Embroiled the Company in Litigation

48. Mat Ishbia's hands-on control over UWM's major business decisions is illustrated by his central, personal role in the Company's "All-In" policy. The policy is a controversial ultimatum announced in March 2021 requiring independent mortgage brokers to stop doing business with UWM's competitors, Rocket Mortgage, LLC and Fairway Independent Mortgage Corp. If brokers do not comply, they risk being cut off from UWM entirely. Mat Ishbia personally unveiled the All-

In initiative to the broker community. Brokers who accepted the ultimatum and later breached it were subject to significant contractual penalties, either $5,000 per loan closed with a prohibited competitor or $50,000 in liquidated damages, whichever was greater.

49. The All-In policy has since spawned years of litigation between UWM and multiple brokerage firms, including UWM's own lawsuit against Atlantic Trust Mortgage Corporation ("Atlantic Trust"), pending in the U.S. District Court for the Eastern District of Michigan (the "Atlantic Trust Litigation"). In that case, Atlantic Trust sought to depose Mat Ishbia personally based on his alleged involvement in determining the nature, amount, and structure of the liquidated-damages provision at the heart of the All-In policy. On December 12, 2025, the court ordered UWM to produce Mat Ishbia for deposition.

50. Rather than comply, UWM resisted producing its own CEO. On March 25, 2026, the court entered a further order reiterating that UWM must produce Mat Ishbia for a deposition of up to four hours. The next day, UWM filed an emergency motion seeking to vacate that order, and proposing that UWM's Chief Legal Officer testify in his place. On April 9, 2026, the court struck UWM's motion for failure to comply with the court's local rules.

51. On April 10, 2026, the presiding judge stated that UWM had made "a mockery" of the federal court rules by failing to produce Mat Ishbia for deposition

despite having been ordered to do so twice. On June 8, 2026, the court held UWM in civil contempt for its failure to comply with the December 12, 2025 order, ordered UWM to pay Atlantic Trust's attorney's fees incurred in bringing the contempt motion, and again directed UWM to produce Mat Ishbia for deposition within thirty days, warning that further noncompliance would result in a second contempt finding and additional financial sanctions.

52. The Atlantic Trust Litigation demonstrates that even in an ordinary contract dispute involving a policy affecting thousands of brokers, decision-making at UWM traces back to Mat Ishbia personally. Additionally, UWM's own institutional reflex is to shield him from having to explain his role in the Company's major decisions.

**The Dual-Class Voting Structure and SFS Corp.**

53. UWM maintains a dual-class capital structure that concentrates voting power in the Ishbia family. As of April 6, 2026, UWM had approximately 1.6 billion shares of common stock outstanding, consisting of roughly 323.9 million shares of Class A common stock, which carries one vote per share, and approximately 1.28 billion shares of Class D common stock, which carries ten votes per share. All of the Class D super-voting stock is held by SFS Corp.

54. Mat Ishbia is the President and sole director of SFS Corp. and holds the power to direct the voting and disposition of the Class D shares SFS Corp. owns.

Although the voting stock of SFS Corp. is held by a South Dakota directed trust, the trustee takes direction from Mat Ishbia, as trust advisor, with respect to the voting and disposition of UWM's stock held by SFS Corp. Through this arrangement, Mat Ishbia personally controls SFS Corp.'s entire block of super-voting stock.

55. The result is near-total voting control. UWM's Amended and Restated Certificate of Incorporation contains a "Voting Limitation" that caps SFS Corp.'s aggregate voting power at 79% of the Company's outstanding stock; absent that cap, SFS Corp. and Mat Ishbia would hold approximately 99% of the combined voting power. Even as capped, Mat Ishbia controls 79% of the vote, more than enough to elect the entire Board, block any stockholder-driven change, and dictate the outcome of virtually any matter submitted to stockholders. SFS Corp. "will continue to have such control as long as it owns at least 10%" of UWM's outstanding common stock.

**UWM Is a Self-Described "Controlled Company" that Forgoes Independent Governance Protections**

56. Because Mat Ishbia and SFS Corp. control a majority of UWM's combined voting power, UWM concedes that it is a "controlled company" under the New York Stock Exchange ("NYSE") corporate governance rules. UWM has affirmatively elected to avail itself of the exemptions available to controlled companies, and as a result it does not maintain a majority-independent Board, does not have a nominating and corporate governance committee, and does not have a compensation committee composed entirely of independent directors. UWM

acknowledges that, as a consequence, its "stockholders do not have the same protections afforded to shareholders of companies that are subject to all" of these governance requirements.

57. Mat Ishbia occupies both the Chairman and CEO roles, and UWM has no lead independent director, a structure the Company justifies expressly "[b]ased on our status as a controlled company." The Company further admits that, so long as it remains a controlled company, its Board "may be guided by the recommendations of the Company's majority stockholder, Mat Ishbia," in selecting director nominees.

**The Board Is Dominated by Ishbia Family Members, Friends, and Officers Controlled by Mat Ishbia**

58. UWM's eleven-member Board reflects Mat Ishbia's control. Six directors are either UWM executives or Ishbia family members, including: Mat Ishbia (Chairman and CEO); his father, Jeff Ishbia (UWM's founder, a paid "Advisor to the CEO," who received $1,670,600 in 2025); Mat Ishbia's brother, Justin Ishbia (a director who also serves as an alternate governor of Mat Ishbia's Phoenix Suns and holds a 23% pecuniary interest in SFS Corp.); and three sitting UWM executive officers, Wilner (Chief Operating Officer), Elezaj (Chief Strategy Officer), and Lawson (Chief People Officer).

59. Notably, the Company's most recent Proxy Statement on Form DEF 14A filed with the SEC on June 3, 2026 (the "2026 Proxy"), states that UWM's Board has "undertaken a review of the independence of each director," yet its independence

determination names only three of UWM's eleven directors, Coopes, Czubak, and Verdun, as purportedly "independent director[s] ... as that term is defined under applicable NYSE listing requirements and rules." The 2026 Proxy does not identify Jeff Ishbia, Justin Ishbia, Thomas, Wilner, Elezaj, or Lawson as independent. Concerning Thomas, this is likely because Thomas is Mat Ishbia's decades-long friend and advisor, as discussed in more detail below.

60. Mat Ishbia's control extends into the Board's committee structure. Although UWM created a two-member subcommittee of purportedly independent directors to set the CEO's pay, Mat Ishbia himself sits on the Compensation Committee and personally recommends the compensation, performance metrics, and targets for every other named executive officer, including the three executive-officer directors. The executive directors' positions and compensation thus depend directly on Mat Ishbia's goodwill.

**Extensive Related-Party Dealings Bind the Board to Mat Ishbia**

61. Mat Ishbia's financial entanglement with the Company is pervasive. UWM leases its corporate campus, including the land and buildings, from entities controlled by Mat Ishbia and his father Jeff Ishbia, paying $20.8 million in lease expense in 2025 alone. UWM entered into an approximately $115 million, ten-year naming rights and sponsorship arrangement with an Ishbia-controlled entity, paying $11.1 million in 2025. UWM leases aircraft from entities Mat Ishbia controls;

retains the law firm of Ishbia & Gagleard, P.C., where Jeff Ishbia is a partner; and pays additional sums to Ishbia-affiliated entities for various services. These ongoing, lucrative relationships further align the Board's interests with Mat Ishbia's and against any effort to hold him accountable. For the past several years, UWM made the following payments to, or entered into the following arrangements with, entities controlled by Mat Ishbia and/or Jeff Ishbia:

| **Related-Party Item** | **Counter-party** | **2022** | **2023** | **2024** | **2025** | **Total** |
|---|---|---|---|---|---|---|
| Campus-Related Leases and Related Expenses | Entities controlled by Jeff Ishbia and Mat Ishbia | $24,900,000 | $20,000,000 | $19,500,000 | $20,800,000 | $85,200,000 |
| Naming Rights and Sponsorship Agreement | Entities controlled by Mat Ishbia | - | - | - | $11,100,000 | $11,100,000 |
| Legal Fees | Firm where Jeff Ishbia is a partner | $600,000 | $600,000 | $600,000 | $600,000 | $2,400,000 |
| Aircraft Usage | Entities controlled by Mat Ishbia | $300,000 | $200,000 | $200,000 | $400,000 | $1,100,000 |
| Loan Appraisal Services | Entities controlled by Justin Ishbia | $100,000 | - | - | - | $100,000 |
| Total paid to Ishbia-controlled entities: | | $25,900,000 | $20,800,000 | $20,300,000 | $32,900,000 | $99,900,000 |

## MAT ISHBIA HAS USED HIS CONTROL OVER UWM TO FUND HIS LIFESTYLE

62. Mat Ishbia's personal fortune flows from his control over UWM. According to published reports, UWM distributed roughly $3 billion in dividends and distributions since 2021, more than 80% of which flowed to the Ishbia family. The Company's dividend has increasingly depended on borrowed money. UWM's secured credit lines rose from essentially zero in September 2025 to nearly $3 billion by June 2026.

63. In February 2023, Mat Ishbia became the controlling owner and Governor of the National Basketball Association's Phoenix Suns. To help fund that acquisition, Mat Ishbia took out a large margin loan from J.P. Morgan secured by his UWM shares, and the 2026 Proxy confirms that 648,792,940 shares of Class D common stock held by SFS Corp. are pledged as security for two separate loan facilities.

## UWM'S LONG-STANDING, PUBLICLY STATED "WE DO NOT HEDGE OUR MSRS" PHILOSOPHY

64. For years, UWM's publicly stated philosophy was that it did not hedge its MSRs, relying instead on its origination franchise as a built-in, or "natural," hedge. Mat Ishbia personally and repeatedly advanced this position to the market. On UWM's November 6, 2025 earnings call for the third quarter of 2025, an analyst asked Mat Ishbia directly for "a quick update on the hedging strategy." Mat Ishbia

rejected the premise and reaffirmed, categorically, that UWM does not hedge: "***We do not hedge our MSRs, as you are hopefully aware of***. I do look at opportunities and look at interest rates and make decisions. Sometimes we do more of it. Sometimes we do less of it. This quarter, we focused less on it because we focused on just dominating the business."

65. Mat Ishbia dismissed any focus on MSR fair-value risk as reflecting a fundamental misunderstanding of UWM's business, telling analysts that "anyone that ... focuses on the MSRs and the fair value just does not understand mortgages," and that MSR fair-value swings had "zero to do with" how he operates the Company. Mat Ishbia explained the "natural hedge" theory in his own words: if rates drop, UWM loses MSR value but "do[es] so much more business" that it comes out ahead; and if rates rise, MSR values increase while origination slows, "that's kind of how we've always played it."

66. UWM's public filings reflected the same posture. The Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2025 (the "2025 Form 10-K"), filed with the SEC on February 25, 2026, disclosed only the routine pipeline instruments that mortgage originators ordinarily carry, interest-rate lock commitments and forward loan sale commitments, and reflected no standing, macro interest-rate position taken against the Company's MSR book.

67. This philosophy defined the market's understanding of UWM's risk

profile. Having repeatedly and emphatically represented that it did not hedge its MSRs, and that its business was insulated from MSR fair-value swings, UWM and Mat Ishbia assumed a duty not to mislead investors if and when that philosophy secretly changed. As set forth below, UWM abandoned this stated approach in the first quarter of 2026, amassing an oversized, directional interest-rate position, without disclosing the reversal or correcting the "no-hedge" narrative Mat Ishbia had so publicly advanced.

**THE PROPOSED TWO HARBORS ACQUISITION**

68. On December 17, 2025, approximately six weeks after Mat Ishbia's "we do not hedge our MSRs" statement, UWM entered into an all-stock merger agreement, valued at approximately $1.3 billion, to acquire Two Harbors, the owner of the RoundPoint mortgage-servicing platform. UWM's stated rationale was to acquire Two Harbors' wholly owned servicing subsidiary, RoundPoint Mortgage Servicing LLC, and its $176 billion unpaid-principal-balance MSR portfolio, nearly doubling UWM's existing MSR book to approximately $400 billion. UWM projected approximately $150 million in annual cost and revenue synergies. The agreement included a $25.35 million termination fee payable by Two Harbors to UWM under specified circumstances.

69. The Two Harbors deal collapsed within months. On March 23, 2026, the Two Harbors board determined that a competing $10.70-per-share all-cash offer

from CrossCountry constituted a "Company Superior Proposal" to the pending UWM merger. Two Harbors gave UWM a four-day contractual "match period," expiring March 25, 2026, to revise its offer. UWM's match period expired without a revised agreement, and on March 27, 2026, Two Harbors terminated its merger agreement with UWM and entered into a new agreement to be acquired by CrossCountry for $10.80 per share in cash. As required by the terminated agreement, CrossCountry paid UWM the $25.35 million termination fee on Two Harbors' behalf. UWM publicly responded that Two Harbors' decision was "driven more by ego, than by sound judgment," and stated that "[t]he deal for us was a strategy to acquire their servicing book, not their operations[.]"

70. Notwithstanding the March 27, 2026 termination, UWM continued to pursue Two Harbors' MSR portfolio for the next several weeks. On May 11, 2026, UWM submitted a revised proposal offering Two Harbors stockholders their choice of $12.50 per share in cash or 2.3328 shares of UWMC stock, exceeding CrossCountry's then pending $12.00-per-share offer. UWM urged Two Harbors stockholders to vote against the CrossCountry merger. On May 13, 2026, after the Two Harbors board rejected that proposal, UWM publicly accused the board of "egregious corporate governance," noting that proxy advisory firms ISS and Glass Lewis had both recommended a vote against the CrossCountry merger. Two

Harbors' board rejected UWM's revised offer, and Two Harbors stockholders ultimately approved the CrossCountry merger.

71. UWM's May 11, 2026 offer to acquire Two Harbors was made without any merger agreement in place, the original agreement having been terminated on March 27, 2026. That same day, UWM filed its Quarterly Report on Form 10-Q for the first quarter ended March 31, 2026 (the "Q1 2026 Form 10-Q"), with the SEC, which disclosed for the first time the existence of the $27.5 billion derivatives position.

## UWM SECRETLY ABANDONED ITS STATED PHILOSOPHY AND AMASSED A $27.5 BILLION DIRECTIONAL RATE BET

72. Contrary to its long-standing "no-hedge" philosophy, and without disclosure, UWM established a massive, standing interest-rate derivatives position during the first quarter of 2026. The position, disclosed for the first time months later in the Company's Q1 2026 Form 10-Q, under the label "other interest rate derivatives," carried a notional value of $27.5 billion, roughly ten times the Company's entire market capitalization.[2] It did not exist as of December 31, 2025.

[2] A notional value is the reference amount used to calculate gains and losses; it is not cash actually at risk or exchanged. If a contract has a $27.5 billion notional value, that doesn't mean $27.5 billion changed hands, it means the payoff formula is applied to that reference amount. This is why a company with a $1-$2 billion market cap can have a derivatives book many times larger than the company itself: notional value measures exposure, not cash outlay.

73. The position was not a hedge; it was a directional wager that amplified, rather than offset, UWM's existing exposure. By March 31, 2026, it was already a $288 million liability that had run a $138.2 million loss through the first quarter, and it required approximately $670 million of Company cash, more than 40% of UWM's total equity, to be posted as margin. The disclosed sensitivity showed that the position stood to lose roughly $360 million from a mere twenty-five-basis-point rise in interest rates, and it profited only if rates fell, the same direction in which UWM's origination franchise already leaned. A genuine hedge offsets risk; this position multiplied it.

74. Even after the stated rationale for the position evaporated, the Two Harbors deal was dead by March 27, 2026, UWM carried the full $27.5 billion notional position into the second quarter of 2026, when it had no contract to acquire Two Harbors and no MSR book to protect. There was no transaction to hedge; there was only the trade. Despite having abandoned the very policy Mat Ishbia had emphatically reaffirmed on November 6, 2025, the Individual Defendants failed to disclose the change or correct the "no-hedge" narrative. Instead, the Individual Defendants continued to reassure investors about the strength and resilience of UWM's business while concealing the existence, size, direction, and mounting losses of the position.

## IMPROPER STATEMENTS

75. Beginning March 9, 2026, the Individual Defendants began making materially false and misleading statements concerning the Company's risk and failed to disclose the hedging related to the Two Harbors transaction. That day, UWM issued a press release in advance of the upcoming stockholder meeting of Two Harbors to announce "additional insight into its anticipated business results for the 2026 fiscal year." In the press release, the Company assured the public that "[e]ven without the Two Harbors transaction" the Company expects total revenue for fiscal year 2026 "to be between $3.5 billion and $4.5 billion." In particular, the press release stated:

> PONTIAC, Mich.--(BUSINESS WIRE)-- UWM Holdings Corporation (NYSE: UWMC) ("UWMC" or the "Company"), the publicly traded indirect parent of United Wholesale Mortgage ("UWM"), the #1 overall mortgage lender in America, provides an update on its forecast in advance of the upcoming stockholder meeting of Two Harbors Investment Corp. (NYSE: TWO) ("Two Harbors"). To provide greater insight into the market, UWMC is updating its outlook for first-quarter total revenue as well as additional insight into its anticipated business results for the 2026 fiscal year.
>
> Mat Ishbia, Chairman, President, and CEO of UWM, said, "Upon further evaluation, we believe it is important to provide an update on our outlook for Q1 and for fiscal year 2026. UWM's total loan origination volume was $49.6 billion for the fourth quarter of 2025, which represents its highest quarterly origination volume since 2021. ***Additionally, our core business fundamentals remain very strong. Even without the Two Harbors transaction, we now expect our total revenue for the first quarter of 2026 to be between $800 million and $900 million, and for fiscal year 2026 to be between $3.5 billion and $4.5 billion***. Further, our investments in AI are now implemented and

> working in multiple areas to make our team members materially more efficient. As such, we remain confident in handling two to three times our current volume while avoiding the need to replace team members who depart through natural attrition. We expect Mia, our voice-enabled AI assistant, to handle over 12 million inbound and outbound calls this year, and the success of this initiative is evident from recent industry information indicating that UWM continues to originate approximately 12% of all refinances and remains the largest originator of purchase loans in the country. ***Lastly, we expect to demonstrate the favorable results of our investments in people and technology over the last three years, as we are ahead of pace to achieve an annualized nine figure run rate in revenue from new products and services, like TRAC+ and PA+."***
>
> UWMC remains excited about the strategic merits and long-term value-creation potential of our proposed acquisition of Two Harbors and continues to urge Two Harbors stockholders, as the Two Harbors Board recommends, to vote in favor of the transaction at the upcoming shareholder meeting.

76. On May 6, 2026, the Company issued a press release announcing the results for the first quarter ended March 31, 2026. The press release purported to report the Company's results:

> Mat Ishbia, Chairman, Chief Executive Officer and President of UWMC, said, "Q1 was an exceptional quarter for UWM and our second-best first quarter of all time. The last time we delivered results of this magnitude, interest rates were nearly 50% lower, which underscores the strength, scale and resilience of our business. Our team and broker partners executed at the highest level, using UWM's proprietary technology and AI-powered tools like Mia to win more loans, more efficiently, every day. We continue to move ahead of schedule with bringing servicing in-house, and regardless of whether rates stay higher or move lower, we are positioned to keep winning as we are built to perform through all cycles. This quarter is a clear proof point of that."

* * *

**Production and Income Statement Highlights** (dollars in thousands, except per share amounts)

| | Q1 2026 | Q4 2025 | Q1 2025 |
|---|---|---|---|
| **Loan origination volume**[1] | **$ 44,944,156** | $ 49,608,104 | $ 32,351,776 |
| **Total gain margin**[1][2] | **1.23%** | 1.22% | 0.94% |
| **Total revenue** | **$ 901,427** | $ 945,247 | $ 613,370 |
| **Net income (loss)** | **170,374** | 164,484 | (247,028) |
| **Diluted earnings (loss) per share** | **0.09** | 0.08 | (0.12) |
| **Adjusted diluted earnings per share**[3] | **N/A** | 0.08 | N/A |
| **Adjusted net income (loss)** [3] | **137,154** | 130,561 | (195,300) |
| **Adjusted EBITDA**[3] | **160,909** | 232,778 | 57,803 |

(1) Key operational metric (see discussion below)
(2) Represents total loan production income divided by loan origination volume
(3) Non-GAAP metric (see discussion and reconciliations below)

**Balance Sheet Highlights as of Period-end** (dollars in thousands)

| | Q1 2026 | Q4 2025 | Q1 2025 |
|---|---|---|---|
| **Cash and cash equivalents** | **$ 423,996** | $ 503,364 | $ 485,024 |
| **Mortgage loans at fair value** | **10,991,101** | 9,932,729 | 8,402,211 |
| **Mortgage servicing rights** | **4,591,855** | 4,073,781 | 3,321,457 |
| **Total assets** | **19,266,244** | 16,928,676 | 14,048,433 |
| **Non-funding debt** [1] | **5,092,831** | 4,292,940 | 3,149,687 |
| **Total equity** | **1,600,901** | 1,593,629 | 1,635,349 |
| **Non-funding debt to equity** [1] | **3.18** | 2.69 | 1.93 |

(1) Non-GAAP metric (see discussion and reconciliations below)

* * *

| | March 31, 2026 | December 31, 2025 |
|---|---|---|
| **Assets** | **(Unaudited)** | |
| Cash and cash equivalents (includes restricted cash of $21.0 million and $16.0 million, respectively) | **$ 423,996** | $ 503,364 |
| Mortgage loans at fair value | **10,991,101** | 9,932,729 |
| Derivative assets | **124,490** | 37,567 |
| Investment securities at fair value, pledged | **98,491** | 100,512 |
| Accounts receivable, net | **1,271,014** | 526,694 |
| Mortgage servicing rights | **4,591,855** | 4,073,781 |
| Premises and equipment, net | **180,523** | 180,199 |
| Operating lease right-of-use asset (includes $91.8 million and $93.4 million with related parties) | **92,616** | 94,310 |
| Finance lease right-of-use asset, net (includes $20.2 million and $20.7 million with related parties) | **20,681** | 21,247 |
| Loans eligible for repurchase from Ginnie Mae | **1,124,020** | 1,133,359 |
| Other assets | **347,457** | 324,914 |
| **Total assets** | **$ 19,266,244** | $ 16,928,676 |
| **Liabilities and Equity** | | |
| Warehouse lines of credit | **$ 9,900,303** | $ 8,912,496 |
| Derivative liabilities | **337,817** | 26,574 |
| Secured line of credit | **2,000,000** | 1,200,000 |
| Borrowings against investment securities | **86,724** | 87,497 |
| Accounts payable, accrued expenses and other | **949,788** | 707,790 |
| Accrued distributions and dividends payable | **161,773** | 161,292 |
| Senior notes | **2,983,152** | 2,981,975 |
| Operating lease liability (includes $98.0 million and $99.7 million with related parties) | **98,811** | 100,596 |
| Finance lease liability (includes $22.4 million and $22.9 million with related parties) | **22,955** | 23,468 |
| Loans eligible for repurchase from Ginnie Mae | **1,124,020** | 1,133,359 |
| **Total liabilities** | **17,665,343** | 15,335,047 |

77. On May 11, 2026, UWM filed the Q1 2026 Form 10-Q. The Q1 2026 Form 10-Q affirmed the previously reported financial results. The Q1 2026 Form 10-Q further stated the following regarding derivatives and risk hedging activities:

NOTE 3 – DERIVATIVES

The Company enters into interest rate lock commitments ("IRLCs") to originate residential mortgage loans at specified interest rates and terms within a specified period of time with customers who have applied for a loan and may meet certain credit and underwriting criteria. To determine the fair value of the IRLCs, each contract is evaluated based upon its stage in the application, approval and origination process for its likelihood of consummating the transaction (or "pullthrough"). Pullthrough is estimated based on changes in market conditions, loan stage, and actual borrower behavior using a historical analysis of IRLC closing rates. Generally, the further into the process the more likely that the IRLC will convert to a loan. The blended average pullthrough rate was 81% and 78% as of March 31, 2026 and December 31, 2025, respectively. The Company primarily uses forward loan sale commitments ("FLSCs") to economically hedge its pipeline of IRLCs and mortgage loans at fair value. ***From time to time, the Company enters into other interest rate derivatives as part of its overall interest rate risk mitigation strategy. These other derivative financial instruments are measured at estimated fair value with changes in fair value recorded in the condensed consolidated statements of operations within the "Gain (loss) on other interest rate derivatives" line item in the "Other gains (losses), net" section.***

The notional amounts and fair values of derivative financial instruments not designated as hedging instruments were as follows (in thousands):

| | March 31, 2026 | | | December 31, 2025 | | |
|---|---|---|---|---|---|---|
| | Fair value | | | Fair value | | |
| | Derivative assets | Derivative liabilities | Notional Amount | Derivative assets | Derivative liabilities | Notional Amount |
| IRLCs | $ 16,456 | $ 35,280 | $ 11,530,889 (a) | $ 27,780 | $ 6,475 | $ 12,221,203 (a) |
| FLSCs | 108,034 | 14,442 | 19,680,278 | 9,787 | 20,099 | 16,964,025 |
| Other interest rate derivatives | — | 288,095 | 27,500,000 | — | — | — |
| Total | $ 124,490 | $ 337,817 | | $ 37,567 | $ 26,574 | |

* * *

***Interest rate lock commitments, loan sale and forward commitments, and other interest rate derivatives***

In the normal course of business, we are party to financial instruments with off-balance sheet risk. These financial instruments include commitments to extend credit to borrowers at either fixed or floating interest rates. IRLCs are binding agreements to lend to a borrower at a specified interest rate within a specified period of time as long as there is no violation of conditions established in the contract. These commitments generally have fixed expiration dates or other termination clauses which may require payment of a fee. As many of these commitments expire without being drawn upon, the total commitment amounts do not necessarily represent future cash requirements. The blended average pull-through rate was 81% and 78% as of March 31, 2026 and December 31, 2025, respectively.

We also enter into contracts to sell loans into the secondary market at specified future dates (commitments to sell loans), and forward commitments to sell MBS at specified future dates and interest rates. We also occasionally enter into other interest rate derivatives as part of our overall interest rate mitigation strategy for MSRs, including interest rate swap futures, treasury futures, and forward loan purchase commitments. These financial instruments include margin call provisions that require us to transfer cash in an amount sufficient to eliminate any margin deficit. A margin deficit generally results from daily changes in the fair value of these financial instruments. We are generally required to satisfy the margin call on the day of or within one business day of such notice.

Following is a summary of the notional amounts of commitments as of dates indicated:

| ($ in thousands) | March 31, 2026 | December 31, 2025 |
|---|---|---|
| Interest rate lock commitments—fixed rate (a) | $ **10,995,424** | $ 11,770,855 |
| Interest rate lock commitments—variable rate (a) | **535,465** | 450,348 |
| Commitments to sell loans | **2,487,714** | 2,608,946 |
| Forward commitments to sell mortgage-backed securities | **17,192,564** | 14,355,079 |
| Other interest rate derivatives | **27,500,000** | — |

78. The Q1 2026 Form 10-Q purportedly warned of risks that "could" or "may" adversely impact UWM, including risks concerning the Company's hedging activities. In particular, the Q1 2026 Form 10-Q stated:

> ***Interest rate risk***
>
> We are subject to interest rate risk which may impact our origination volume and associated revenue, MSR valuations, IRLCs and mortgage loans at fair value valuations, and the net interest margin derived from our funding facilities. The fair value of MSRs is driven primarily by interest rates, which impact expected prepayments. In periods of rising interest rates, the fair value of the MSRs generally increases as expected prepayments decrease, consequently extending the estimated life of the MSRs, and estimated float earnings increase, resulting in expected increases in cash flows. In a declining interest rate environment, the fair value of MSRs generally decreases as expected prepayments increase consequently truncating the estimated life of the MSRs, and estimated float earnings decrease, resulting in expected decreases in cash flows. Loan origination volumes tend to increase in declining interest rate environments and decrease in increasing rate environments, therefore we believe that our origination business provides a natural hedge to servicing. We periodically evaluate our overall interest rate risk management strategy with respect to MSRs, which includes consideration of our natural business model hedge, regular sales of MSRs and excess servicing cash flows, and at times entering into other interest rate derivatives to mitigate the interest rate risk associated with all or a portion of our MSR portfolio.
>
> * * *
>
> We assess our market risk based on changes in interest rates utilizing a sensitivity analysis. The sensitivity analysis measures the potential impact on fair values based on hypothetical changes (increases and decreases) in interest rates. Our total market risk is influenced by a wide variety of factors including market volatility and the liquidity of the markets. There are certain limitations inherent in the sensitivity analysis presented, including the necessity to conduct the analysis based on a single point in time and the inability to include the complex market

> reactions that normally would arise from the market shifts modeled. We used March 31, 2026 market rates on our instruments outstanding at that time to perform the sensitivity analysis. These sensitivities are hypothetical and presented for illustrative purposes only. Changes in fair value based on variations in assumptions generally cannot be extrapolated to our performance because the relationship of the change in fair value may not be linear nor does it factor ongoing operations. The following table summarizes the estimated change in the fair value of our mortgage loans at fair value, MSRs, IRLCs, FLSCs, and other interest rate derivatives as of March 31, 2026 given hypothetical instantaneous parallel shifts in the yield curve. Actual results could differ materially.

79. The above statements were materially false and misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose that: (i) UWM had deviated from its traditional strategy of not hedging its MSRs to take a major hedge position; (ii) the Company over-hedged itself in anticipation of the Two Harbors transaction; (iii) UWM's purported efforts to balance its risk in fact created an excess hedging risk; and (iv) that, as a result of the foregoing, the positive statements about the Company's business, operations, and prospects were materially misleading and lacked a reasonable basis.

## THE TRUTH EMERGES

80. On August 5, 2026, during after-market hours, UWM reported its second quarter 2026 financial results, including a $603.2 million interest-rate derivatives loss which contributed to a $451.9 million second quarter net loss. Total

equity also fell 43.6% year over year, reflecting the net loss and derivative-related charges.

81. The next day, the Company held an earnings call in connection with its second quarter 2026 results. During the call, Mat Ishbia disclosed "***We were overhedged***, if you think of it that way, protecting against the Two Harbors transaction." Mat Ishbia further stated that ***"[w]e don't traditionally hedge our MSRs***" but "when you're going through and acquiring a company like Two Harbors and a massive MSR book … it created a little more risk. ***So ... we did put a hedge on to protect against that risk and then a lot of things happen[ed … and then obviously, the Two Harbors transaction went away***." In particular, Mat Ishbia stated:

> So listen, hedging in general in the mortgage industry is expensive. ***And it's something I actually don't believe in, in general.*** We have never hedged our MSR, I say never. We don't traditionally hedge our MSRs. Our origination machine is so big and strong that if the rates drop, you'll lose MSR value and equity, but you'll do so much more business that you're good. And if rates go up, your MSR values go up and you do less originations, but your equity goes up. That's kind of how we've always played it.
>
> Well, when you're going through and acquiring a company like Two Harbors and a massive MSR book, then our MSR book became double the size of what we've always managed. And therefore, it created a little more risk. So when we did put a hedge on to protect against that risk and then a lot of things happen.
>
> Let's just be real with whether it's a war, a lot of different things that happened that created the 10-year to go up -- and then obviously, ***the Two Harbors transaction went away. And so a confluence of events***

> ***that created a hedge loss.*** We hit a certain risk threshold that I said we're not going to continue hedging regardless because we didn't want to have more of an equity drain, and we took the hedge off. And of course, ***that's the strategy that we've always had is let's not hedge***, let's run the business effectively.
>
> Once again, Oaktree has a strategic perspective on this, and I'll go through that with them after this process and whether we hedge going forward or not. But once you have $3 billion of equity, you're really not at a risk of the MSR values go down $400 million for this quarter or go up $400 million, it's less relevant. But when you're hovering around $1.5 billion or $2 billion, it becomes a little bit more relevant. And so that became an issue. ***We hedged -- and it was a onetime event, to be honest with you, because of Two Harbors, we were overhedged, if you think of it that way, protecting against the Two Harbors transaction.*** The market moved against us, and it's a onetime event that won't happen again. We feel like our hedging policies are much stronger now, but also we're not acquiring another company that has an MSR book like that, at least that's not the plan of now, and we know how to handle it differently going forward.

82. Following the news, UWM's stock price dropped from $1.84 per share on August 5, 2026, to $1.20 per share on August 6, 2026, a one-day decline of 34.78% and a $219 million market capitalization loss.

## THE DILUTIVE OAKTREE RESCUE AND THE COLLAPSE OF THE COMPANY'S CAPITAL POSITION

83. The Individual Defendants' undisclosed derivatives bet did far more than generate a one-quarter loss. It broke the Company's balance sheet and forced UWM into a costly, dilutive rescue that stripped common stockholders of their dividend, their place in the capital stack, and ultimately a measure of control over the Company itself.

84. By the time the truth emerged, the position had cut the Company's equity nearly in half. UWM's total equity fell from approximately $1.6 billion on March 31, 2026, to roughly $985 million on June 30, 2026, a decline of approximately 38% in a single quarter, and a 43.6% year-over-year decline. This deterioration did not occur in a vacuum. For years, UWM had weakened its own balance sheet through an unsustainable dividend: the Company distributed roughly $3 billion in dividends and distributions since 2021, more than 80% of which flowed to the Ishbia family, and that dividend increasingly depended on borrowed money, as UWM's secured credit lines rose from essentially zero in September 2025 to nearly $3 billion by June 2026. A company already strained by years of cash extraction was in no position to absorb a $603.2 million trading loss.

85. To survive, UWM was compelled to accept an emergency capital infusion on unfavorable terms. On August 5, 2026, the Company announced a $2.05 billion equity investment from Oaktree's distressed-situations desk and from SFS Group, a newly formed investment vehicle wholly owned by the Ishbia family. At the same time, and in a sharp reversal from the "very strong" fundamentals the Individual Defendants had touted throughout the relevant period, UWM suspended its common dividend to preserve capital.

86. The rescue came at a steep and lasting cost to the Company and its public stockholders. Under the Investor Rights Agreement, dated August 5, 2026,

Oaktree obtained representation on UWM's Board, and secured a contractual veto over the Company's most fundamental financial decisions, including a clause requiring Oaktree executives to approve UWM's "capitalization and hedging policy." The agreement further provides that, if UWM fails to meet certain obligations, Oaktree can take control of the entire Company. In short, a company that had for years been governed with minimal outside oversight was forced to surrender core governance authority to an outside investor, and its common stockholders were left diluted, deprived of their dividend, and subordinated in the capital structure, all as a direct and proximate result of the Individual Defendants' misconduct.

## INSIDER SALES BY MAT ISHBIA

87. Rather than providing the market with correct information, Mat Ishbia used his knowledge of UWM's material, nonpublic information to sell his and his brother's personal holdings while the Company's stock was artificially inflated. As an officer and director of UWM, Mat Ishbia was privy to material, nonpublic information about the Company's true business health.

88. While in possession of material, nonpublic information, Mat Ishbia sold 41,487,684 shares of his personally held UWM stock for proceeds of $152.3 million. His sales were timed to maximize profit from UWM's then artificially inflated stock price. Mat Ishbia's last sale was on May 8, 2026, just days before UWM first

disclosed the $27.5 billion position in the Q1 2026 Form 10-Q. Mat Ishbia's sales are detailed in the table below:

| Insider Last Name | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| **ISHBIA, MAT Current President, CEO, Chair, and 10% Owner** | 3/10/2026 | 632,874 | $4.13 | $2,613,769.62 |
| | 3/11/2026 | 632,874 | $3.91 | $2,474,537.34 |
| | 3/12/2026 | 632,874 | $3.78 | $2,392,263.72 |
| | 3/13/2026 | 632,874 | $3.69 | $2,335,305.06 |
| | 3/16/2026 | 1,000,574 | $3.70 | $3,702,123.80 |
| | 3/17/2026 | 1,000,574 | $3.67 | $3,672,106.58 |
| | 3/18/2026 | 1,000,574 | $3.73 | $3,732,141.02 |
| | 3/19/2026 | 1,000,574 | $3.67 | $3,672,106.58 |
| | 3/20/2026 | 1,000,574 | $3.60 | $3,602,066.40 |
| | 3/23/2026 | 1,000,574 | $3.72 | $3,722,135.28 |
| | 3/24/2026 | 1,000,574 | $3.63 | $3,632,083.62 |
| | 3/25/2026 | 1,000,574 | $3.55 | $3,552,037.70 |
| | 3/26/2026 | 1,000,574 | $3.46 | $3,461,986.04 |
| | 3/27/2026 | 1,000,574 | $3.49 | $3,492,003.26 |
| | 3/30/2026 | 1,000,574 | $3.52 | $3,522,020.48 |
| | 3/31/2026 | 1,000,574 | $3.55 | $3,552,037.70 |
| | 4/1/2026 | 1,000,574 | $3.63 | $3,632,083.62 |
| | 4/2/2026 | 1,000,574 | $3.69 | $3,692,118.06 |
| | 4/6/2026 | 1,000,574 | $3.73 | $3,732,141.02 |
| | 4/7/2026 | 1,000,574 | $3.61 | $3,612,072.14 |
| | 4/8/2026 | 1,000,574 | $3.87 | $3,872,221.38 |
| | 4/9/2026 | 1,000,574 | $3.91 | $3,912,244.34 |
| | 4/10/2026 | 1,000,574 | $3.71 | $3,712,129.54 |
| | 4/13/2026 | 1,000,574 | $3.66 | $3,662,100.84 |
| | 4/14/2026 | 1,000,574 | $3.71 | $3,712,129.54 |
| | 4/15/2026 | 1,000,574 | $3.78 | $3,782,169.72 |
| | 4/16/2026 | 1,000,574 | $3.76 | $3,762,158.24 |
| | 4/17/2026 | 1,000,574 | $3.93 | $3,932,255.82 |
| | 4/20/2026 | 1,000,574 | $3.94 | $3,942,261.56 |
| | 4/21/2026 | 1,000,574 | $3.82 | $3,822,192.68 |
| | 4/22/2026 | 1,000,574 | $3.70 | $3,702,123.80 |
| | 4/23/2026 | 1,000,574 | $3.65 | $3,652,095.10 |
| | 4/24/2026 | 1,000,574 | $3.75 | $3,752,152.50 |
| | 4/27/2026 | 1,000,574 | $3.78 | $3,782,169.72 |
| | 4/28/2026 | 986,644 | $3.66 | $3,611,117.04 |
| | 4/29/2026 | 1,000,574 | $3.50 | $3,502,009.00 |
| | 4/30/2026 | 934,061 | $3.53 | $3,297,235.33 |
| | 5/1/2026 | 1,001,024 | $3.62 | $3,623,706.88 |
| | 5/4/2026 | 1,003,333 | $3.57 | $3,581,898.81 |
| | 5/5/2026 | 1,003,333 | $3.45 | $3,461,498.85 |
| | 5/6/2026 | 1,003,333 | $3.66 | $3,672,198.78 |

| | | | | |
|---|---|---|---|---|
| | 5/7/2026 | 1,003,333 | $3.39 | $3,401,298.87 |
| | 5/8/2026 | 1,003,333 | $3.39 | $3,401,298.87 |
| | **Total:** | **41,487,684** | | **$152,351,806.25** |

## DAMAGES TO UWM

89. As a result of the Individual Defendants' improprieties, UWM disseminated improper, public statements concerning its business, risk profile, and hedging activities, and concealed that it had abandoned its stated "no-hedge" philosophy to amass an undisclosed, oversized, directional interest-rate derivatives position. When the truth emerged, the position had inflicted a $603.2 million interest-rate derivatives loss, which drove a $451.9 million second-quarter 2026 net loss and a 43.6% year-over-year decline in the Company's total equity. These improper statements have devastated UWM's credibility as reflected by the Company's almost $220 million, or 34.78%, market capitalization loss.

90. The wrongdoing also forced the Company into a costly and dilutive emergency capital raise on unfavorable terms. To shore up its depleted balance sheet, UWM was compelled to accept a $2.05 billion equity investment from Oaktree's distressed-situations desk and the Ishbia family's SFS Group, and to suspend its common dividend to preserve capital. As part of that rescue, UWM ceded governance control it would not otherwise have surrendered, including Board representation for Oaktree and a contractual veto over the Company's "capitalization and hedging policy," with the potential, under the terms of the deal, for Oaktree ultimately to take control of the Company itself.

91. UWM's performance issues also damaged its reputation within the business community and in the capital markets. In addition to price, UWM's current and potential customers consider UWM's ability to accurately value its business prospects and evaluate risk and growth potential. Businesses are less likely to award contracts to companies that are uncertain about their own financial conditions. UWM's ability to raise equity capital or debt on favorable terms in the future is now impaired. In addition, the Company stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections disseminated by the Individual Defendants have materially increased the perceived risks of investing in and lending money to the Company.

92. Further, as a direct and proximate result of the Individual Defendants' actions, UWM has expended, and will continue to expend, significant sums of money. Such expenditures include, but are not limited to:

(a) costs incurred from defending and paying any settlement in the Securities Class Action for violations of federal securities laws; and

(b) costs incurred from compensation and benefits paid to the defendants who have breached their duties to UWM.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

93. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct,

and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

94. During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including stockholders of UWM, regarding the Individual Defendants' management of UWM's operations, the Company's abandonment of its stated policy of not hedging its mortgage servicing rights, and the existence, size, direction, and mounting losses of the Company's undisclosed $27.5 billion interest-rate derivatives position; (ii) facilitate Mat Ishbia's illicit sale of over $152.3 million of his personally held shares while in possession of material, nonpublic information concerning that position; and (iii) enhance the Individual Defendants' executive and directorial positions at UWM and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

95. The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, and

unjust enrichment; and to conceal adverse information concerning how UWM had secretly reversed its long-standing "no-hedge" philosophy and taken on an oversized, directional interest-rate bet that exposed the Company to catastrophic loss and, in fact, caused a $603.2 million derivatives loss and a 43.6% decline in total equity.

96. The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company to purposefully or recklessly issue materially false and misleading statements and omissions concerning its business, risk profile, and hedging activities, and by concealing the existence and mounting losses of the undisclosed derivatives position while Mat Ishbia disposed of UWM stock at artificially inflated prices. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

97. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

98. Plaintiff brings this action derivatively in the right and for the benefit of UWM to redress injuries suffered, and to be suffered, by UWM as a direct result of breaches of fiduciary duty and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants. UWM is named as a nominal defendant solely in a derivative capacity.

99. Plaintiff will adequately and fairly represent the interests of UWM in enforcing and prosecuting its rights.

100. Plaintiff was a stockholder of UWM at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current UWM stockholder.

101. The current Board of UWM consists of the following eleven individuals: Mat Ishbia, Jeff Ishbia, Justin Ishbia, Thomas, Czubak, Verdun, Coopes, Elezaj, Wilner, and Lawson and non-party Nicholas Basso ("Basso"). Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Demand Is Excused Because Mat Ishbia and Justin Ishbia Received a Material Personal Benefit**

102. Mat Ishbia received a material personal benefit from the very misconduct challenged in this action. While the undisclosed $27.5 billion derivatives position was concealed from the market and UWM's stock traded at artificially

inflated prices, Mat Ishbia caused SFS Corp., the family vehicle over which he exercises sole voting and dispositive power, to sell UWM stock, monetizing his holdings before the truth was revealed and the stock collapsed. A director who personally sold stock while in possession of material, non-public information, and who stood to profit from the concealed rate bet had it paid off, is plainly interested in the outcome of this litigation.

103. Mat Ishbia separately received a material personal benefit from the very rescue financing that his misconduct necessitated: Mat Ishbia is the manager and owns 75% of SFS Group, the entity that purchased $150 million of senior, cumulative, 10%–13% dividend-bearing Series A-2 Preferred Stock in the August 2026 rescue. This was a senior, dividend-bearing position secured for Mat Ishbia personally at the very moment common stockholders lost their dividend entirely.

104. Justin Ishbia received a material personal benefit from the challenged insider sales because he holds a 23% pecuniary interest in SFS Corp., the entity through which the sales were made. He therefore profited directly and proportionally from the sale of UWM stock at artificially inflated prices, and shared in the distributions the Ishbia family extracted from the Company. A director who profited from the very transactions the Company would be required to challenge cannot impartially consider a demand to disgorge those proceeds.

**Demand Is Excused Because Mat Ishbia, Justin Ishbia, Jeff Ishbia, Thomas, Czubak, Verdun, Coopes, Elezaj, Wilner, and Lawson Face a Substantial Likelihood of Liability for Their Misconduct**

105. As alleged above, the Individual Defendants breached their fiduciary duties of loyalty by making improper statements in the Company's press releases and SEC filings regarding the Company's interest-rate risk profile and hedging practices. Specifically, they represented that UWM adhered to its long-standing strategy of not hedging its mortgage servicing rights and that its origination franchise served as a "natural hedge" to servicing, while concealing that the Company had secretly amassed a $27.5 billion notional directional interest-rate derivatives position that vastly exceeded any legitimate hedging need, which amplified rather than mitigated the Company's exposure, required approximately $670 million of Company cash to be posted as margin, and had already generated substantial losses. The Individual Defendants continued to assure investors that the Company's "core business fundamentals remain[ed] very strong" and that UWM was "built to perform through all cycles," when in truth the concealed position exposed the Company to catastrophic loss if interest rates rose, as they ultimately did, causing a $603.2 million derivatives loss, a $451.9 million net loss, and a 43.6% year-over-year decline in total equity.

106. Mat Ishbia faces a substantial likelihood of liability as the central wrongdoer in this action. As the Company's controlling stockholder, Chairman,

President, and CEO, Mat Ishbia personally made the false and misleading statements alleged herein including that the Company was "built to perform through all cycles" while concealing the undisclosed $27.5 billion directional interest-rate position. He directed and maintained that position, and he caused SFS Corp. to sell UWM stock while in possession of material, non-public information concerning it, in breach of his duty of loyalty. A director who made the misstatements, directed the trade, and personally traded on the concealed information cannot impartially consider a demand to sue himself for that conduct.

107. Coopes, Czubak, and Verdun, as members of the Audit Committee, face a substantial likelihood of liability for permitting the Company's materially false and misleading risk disclosures to be disseminated. Under the Audit Committee Charter, these defendants were specifically charged with the duty to "[d]iscuss guidelines and policies governing the process by which senior management of the Company assess and manage the Company's exposure to risk, as well as the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures." The Charter further required them to review the Company's quarterly financial statements and its "Management's Discussion and Analysis" disclosures, and to review the earnings guidance the Company provided to analysts. The undisclosed $27.5 billion position, roughly ten times the Company's market capitalization and requiring approximately $670 million of Company cash as

margin, was precisely the sort of "major financial risk exposure" the Charter obligated these defendants to oversee. Yet the Audit Committee Defendants approved or permitted risk disclosures that mischaracterized the position as routine, occasional "risk mitigation" and warned only of hypothetical harms that had already materialized. Having failed to discharge their chartered oversight duties in the face of a company-threatening risk, the Audit Committee Defendants face a substantial likelihood of liability and cannot impartially consider a demand.

**Demand Is Excused Because a Majority of the Board Lacks Independence from Mat Ishbia and Justin Ishbia**

108. Mat Ishbia's domination of UWM is near-total and pervades every level of the Company's governance, such that no director owes his or her position to anyone but him. Through SFS Corp., Mat Ishbia controls all of the Company's Class D common stock, which carries ten votes per share, and he directs the voting and disposition of those shares as trust advisor. UWM's Amended and Restated Certificate of Incorporation caps SFS Corp.'s voting power at 79% of the Company's outstanding stock; absent that cap, Mat Ishbia would control approximately 99% of the vote. Even as capped, Mat Ishbia's 79% voting power is more than sufficient to elect the entire Board, remove any director, block any stockholder-initiated action, and dictate the outcome of virtually every matter submitted to a stockholder vote, and it will persist so long as SFS Corp. holds at least 10% of the Company's outstanding common stock.

109. Mat Ishbia's control is not merely a function of his votes. He serves simultaneously as Chairman, President, and CEO, and the Company maintains no lead independent director, a structure UWM justifies expressly on the basis of its "controlled company" status. UWM concedes that, so long as it remains a controlled company, its Board "may be guided by the recommendations of the Company's majority stockholder, Mat Ishbia," in selecting director nominees. Thus, Mat Ishbia effectively hand-picks the very directors who would decide whether to sue him in response to a demand. Mat Ishbia sits on the Compensation Committee and personally recommends the compensation, performance metrics, and targets for every other named executive officer, including the three executive-officer directors who serve at his pleasure. He is also entwined with the Company financially far beyond his equity: UWM leases its corporate campus from entities Mat Ishbia and his father, Jeff Ishbia, control for $20.8 million in annual lease expense, pays an Ishbia-controlled entity approximately $11.1 million per year under a naming-rights arrangement, leases aircraft from Ishbia-controlled entities, and retains the law firm at which director Jeff Ishbia is Managing Partner. Reflecting the totality of this control, Mat Ishbia is one of only two individuals named as proxy holders authorized to vote other stockholders' shares at the annual meeting. A board so thoroughly dominated by a single controlling fiduciary, who selects its members, sets their pay,

and holds the votes to remove them, cannot impartially consider a demand to sue that fiduciary for the misconduct alleged herein.

110. To start, Jeff Ishbia is Mat Ishbia and Justin Ishbia's father and the founder of the Company. A director bound to the controlling stockholder by the closest familial ties and by lucrative, ongoing financial arrangements with the Company cannot impartially consider a demand to sue his sons. Likewise, Justin Ishbia cannot impartially consider a demand to sue his father and brother and Mat Ishbia cannot impartially consider a demand to sue his father and brother.

111. Thomas is not independent of Mat Ishbia. Although UWM's 2026 Proxy lists Thomas as a director, the 2026 Proxy does not include him among the Company's purportedly "independent" directors, and Thomas's actual relationship with Mat Ishbia is a decades-long personal friendship intertwined with mutual business dealings. Mat Ishbia's admiration for Thomas dates back to Thomas' playing career, long before the two men had any business relationship: as Mat Ishbia has stated, "I just fell in love with it, and I loved watching Isiah Thomas." Mat Ishbia, a Detroit-area native, grew up idolizing Thomas, the Hall of Fame guard who led the Detroit Pistons to back-to-back championships, and the press has described Mat Ishbia as an "Isiah Thomas superfan." The two are, in Thomas's own words, "***very close***" friends, and Thomas has described Mat Ishbia as a business mentor who "advised me in the business space" and on whom Thomas "called … quite frequently

in the past to help me navigate some of our growing pains … ***We've become very good friends***." Mat Ishbia has publicly stated: "***Isiah is a friend of mine***. I talk to Isiah just like I talk to Tom Izzo, just like I talk to Draymond Green. I talk to all my basketball connections through my life. Nobody has a formal title."

112. The relationship also runs in the opposite direction, with Thomas serving as an advisor to Mat Ishbia personally; as Thomas has publicly acknowledged, "I sit on the board of United Wholesale Mortgage and Matt Ishbia owns the Phoenix Suns. And I am an advisor/consultant to him." That advisory relationship extends to Mat Ishbia's separately owned NBA franchise, the Phoenix Suns, where Thomas has informally advised the organization and was widely reported to be in line for a prominent front-office role. Indeed, Mat Ishbia was still publicly fielding questions about his relationship with Thomas as recently as January 2026. A director who is a close friend of, and paid advisor to, the controlling stockholder cannot impartially weigh a demand to sue him.

113. Wilner is UWM's Chief Operating Officer and a director of the Company, and her 2025 total compensation was $9,699,603. Elezaj is UWM's Chief Strategy Officer and a director of the Company, and his 2025 total compensation was $9,603,924. Lawson is UWM's Chief People Officer and a director of the Company, and her 2025 total compensation was $1,372,401. Each of Wilner, Elezaj, and Lawson owes her or his position and compensation to Mat Ishbia, who

personally sits on the Compensation Committee and recommends the compensation, performance metrics, and targets for every other named executive officer. As a result, each of Wilner, Elezaj, and Lawson depends on Mat Ishbia for her or his livelihood and cannot impartially consider a demand that would require suing the very person who controls it.

114. Czubak is not independent of Justin Ishbia and Mat Ishbia. Czubak and Justin Ishbia attended Michigan State University during an overlapping period from 1998 through 2000, during which time Mat Ishbia played on the men's basketball team while Czubak was a member of the women's basketball team. On information and belief, this shared history at Michigan State gave rise to a personal relationship between Czubak and the Ishbia brothers that predates, and exists independent of, her service on UWM's Board and Audit Committee. A director who shares this kind of long-standing personal history with both the controlling stockholder and his brother cannot impartially weigh a demand to sue them.

115. Verdun is not independent of Justin Ishbia. Verdun and Justin Ishbia have been members of the Young Presidents' Organization ("YPO") during an overlapping period beginning in July 2019 and continuing through the present. YPO is a selective, invitation-only global network of chief executives who meet regularly in small "forums" for confidential peer discussion, mentorship, and mutual support, relationships that YPO itself describes as extending well beyond ordinary business

acquaintance. Verdun's ongoing YPO relationship with Justin Ishbia compromises his ability to impartially consider a demand adverse to the Ishbia family. Verdun's independence is further compromised by his ongoing business relationship with Elezaj: in 2026, Elezaj was featured as a speaker at the Scaling Up Experience, an event organized by Scaling Up Coaches, the company where Verdun serves as CEO. A director who maintains an ongoing personal network relationship with the controlling stockholder's brother, and a simultaneous business relationship with another interested director, cannot impartially weigh a demand implicating either of them.

116. Non-party Basso is not independent for purposes of considering a demand adverse to Mat Ishbia or Justin Ishbia. Basso served as a Managing Director of Oaktree since 2011 (with a brief departure from June 2020 to April 2023) and was elevated to Co-Head of Americas in July 2026, one month before his appointment to UWM's Board. Basso is a designee of Oaktree, which was appointed to the Board solely in connection with the August 2026 rescue financing. That financing was a joint transaction in which Oaktree and the Ishbia family, through their newly formed vehicle SFS Group, invested alongside one another. Oaktree purchased $1.5 billion of Series A-1 Preferred Stock and the Ishbia vehicle purchased $150 million of Series A-2 Preferred Stock. Mat Ishbia is the manager and owns 75% of SFS Group. Basso's principal, Oaktree, thus holds a substantial preferred-equity investment

whose value depends on the continued financial health of a company that Mat Ishbia controls and operates, and Oaktree co-invested on the same side of the transaction as the Ishbia family. As Oaktree's designated representative, Basso is beholden to the ongoing, intertwined business relationship between Oaktree and the controlling stockholder, and cannot be expected to impartially weigh a demand to sue Mat Ishbia, the person whose leadership and control Oaktree's own investment is premised upon.

117. For the reasons above, Mat Ishbia and Justin Ishbia received a material personal benefit from their misconduct; Mat Ishbia, Justin Ishbia, Jeff Ishbia, Thomas, Czubak, Verdun, Coopes, Elezaj, Wilner, and Lawson face a substantial likelihood of liability; and a majority of the Board lacks independence from Mat Ishbia, Justin Ishbia, and Jeff Ishbia. Accordingly, the entire Board is incapable of impartially considering a pre-suit demand. Demand is therefore futile and is excused.

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duty

118. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

119. The Individual Defendants owed and owe UWM fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe UWM the highest obligation of care and loyalty.

120. Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, and reasonable inquiry, causing the Company to engage in the misconduct described herein.

121. The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding the wrongdoing of such substantial magnitude and duration. The Officer Defendants either knew, were reckless, or were grossly negligent in not knowing that: (i) UWM had abandoned its long-standing, publicly stated strategy of not hedging its mortgage servicing rights and had secretly amassed an undisclosed $27.5 billion notional directional, interest-rate derivatives position; (ii) the position vastly exceeded any legitimate hedging need, amplified rather than mitigated the Company's interest-rate exposure, and required approximately $670 million of Company cash to be posted as margin; (iii) the Company's public statements touting its "very strong" fundamentals and ability to "perform through all cycles" were materially false and misleading and omitted the existence, size, direction, and mounting losses of that position; and (iv) as a result, the Company was exposed to catastrophic loss if interest rates rose. Accordingly, the Officer Defendants breached their duties of care and loyalty to the Company.

122. The Director Defendants, as directors of the Company, owed UWM the highest duty of loyalty. These defendants breached their duty of loyalty by permitting the Company to abandon its stated no-hedge philosophy, to conceal the undisclosed derivatives position and its losses from the market, and to disseminate materially false and misleading statements concerning the Company's business, risk profile, and hedging activities. The Director Defendants knew or were reckless in not knowing that: (i) the Company had reversed its stated hedging strategy without disclosure; (ii) the $27.5 billion position exposed the Company to a loss that would, and did, cut the Company's equity nearly in half; and (iii) the Company's public statements concerning its risk profile were materially false and misleading. Accordingly, these defendants breached their duty of loyalty to the Company.

123. The Audit Committee Defendants breached their fiduciary duty of loyalty by approving the statements described herein, which were made during their tenure on the Audit Committee, and which they knew or were reckless in not knowing contained improper statements and omissions. The Audit Committee Defendants failed in their duty to appropriately review the Company's financial statements, risk disclosures, and earnings guidance, as required by the Audit Committee Charter in effect at the time.

124. Mat Ishbia breached his duty of loyalty by causing SFS Corp. to sell UWM stock on the basis of the material, nonpublic information described above

before that information was revealed to the Company's stockholders. The information described above was material, nonpublic information concerning the Company's business, risk profile, and future prospects. It was a proprietary asset belonging to the Company, which Mat Ishbia used for his own benefit when he caused the sale of UWM common stock.

125. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, UWM has sustained significant damages, as alleged herein. As a result of the misconduct alleged herein, these defendants are liable to the Company.

126. Plaintiff, on behalf of UWM, has no adequate remedy at law.

**COUNT II**

**Against the Individual Defendants for Unjust Enrichment**

127. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

128. By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of UWM. The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to UWM.

129. Mat Ishbia caused SFS Corp. to sell UWM stock while in possession of material, nonpublic information that artificially inflated the price of UWM stock.

As a result, Mat Ishbia profited from his misconduct and was unjustly enriched through his exploitation of material and adverse inside information.

130. Plaintiff, as a stockholder and representative of UWM, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

131. Plaintiff, on behalf of UWM, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of UWM, demands judgment as follows:

A. Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties and unjust enrichment;

B. Directing UWM to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect UWM and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1. a provision to control and monitor insider stock sales, including enhanced pre-clearance and trading-plan review procedures;

2. a proposal to establish and strengthen Board-level oversight of the Company's interest-rate risk and derivatives and hedging activities, including the adoption of a formal hedging policy with position limits and independent risk oversight;

3. a proposal to strengthen the Company's controls over financial reporting and its risk-related public disclosures;

4. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

5. a provision to permit the stockholders of UWM to nominate at least three candidates for election to the Board; and

6. a proposal to strengthen UWM's oversight of its disclosure procedures;

C. Extraordinary equitable and injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of UWM has an effective remedy;

D. Awarding to UWM restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants, including all ill-gotten gains from insider selling by Mat Ishbia;

E. Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F. Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: August 31, 2026

**FINK BRESSACK**

/s/ David H. Fink
David H. Fink (P28235)
Nathan J. Fink (P75185)
38500 Woodward Ave., Suite 350
Bloomfield Hills, MI 48304
(248) 971-2500
dfink@finkbressack.com
nfink@finkbressack.com

**ROBBINS LLP**
Brian J. Robbins
Craig W. Smith
Shane P. Sanders
Maria L. Mansur
5060 Shoreham Place, Suite 300
San Diego, CA 92122
(619) 525-3990
brobbins@robbinsllp.com

csmith@robbinsllp.com
ssanders@robbinsllp.com
mmansur@robbinsllp.com

*Attorneys for Plaintiff*

**VERIFICATION**

I, Michael Farzad, hereby declare as follows:

I am the plaintiff in this action. I have read the verified stockholder derivative complaint. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: 8/28/2026

Signed by:
Michael Farzad
620DACC1B728404

MICHAEL FARZAD